*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* JUSTIN PAUL DI REZZE, M.D.

DEPARTMENT OF LICENSING AND
REGULATORY AFFAIRS,

      Petitioner-Appellee,

v

JUSTIN PAUL DI REZZE, M.D.,

      Respondent-Appellant.

UNPUBLISHED
September 17, 2025
10:22 AM

No. 370615
LARA
Bureau of Professional Licensing
LC No. 22-004852

Before: K. F. KELLY, P.J., and PATEL and FEENEY, JJ.

PER CURIAM.

In this professional-discipline action, respondent appeals as of right a final order of the Board of Medicine's Disciplinary Subcommittee (DSC), part of the Bureau of Professional Licensing (BPL) in the Department of Licensing and Regulatory Affairs (LARA), placing him on probation for a period of one day to six months, requiring him to complete 10 hours of continuing education, and imposing a fine of $2,500, for violating MCL 333.16221(a).[1]  We affirm.

## I. FACTS

Respondent is a physician licensed to practice medicine in Michigan, and, at the relevant time, served as the medical director of Wellbridge of Grand Blanc (Wellbridge), a nursing and

---

[1] MCL 333.16221(a) authorizes the DSC to impose sanctions, under MCL 333.16226, for "a violation of general duty," defined in part as "negligence or failure to exercise due care, including negligent delegation to or supervision of employees or other individuals, whether or not injury results . . . ."

rehabilitation facility. This disciplinary action arose from respondent's treatment of patient AH,[2] an elderly man who had been hospitalized for a urinary-tract infection and sepsis immediately before his admission at Wellbridge; AH was weak, could not walk, needed help with day-to-day activities, and suffered from diabetes, hyperlipidemia, and hypertension. AH was admitted at Wellbridge on the evening of March 14, 2019, but on March 25, 2019, at his family's insistence, AH was transported to Ascension Genesys Hospital (Ascension), then, that same night, to the emergency department at the University of Michigan (UM) Hospital in Ann Arbor, where he was admitted.

## A. COMPLAINT

In May 2019, members of AH's family filed a complaint with the BPL, and an investigation into respondent's treatment of AH at Wellbridge was conducted. In January 2020, petitioner served an administrative complaint on respondent. Petitioner alleged that AH had been hospitalized for sepsis, following a urinary-tract infection, before he was transported to Wellbridge "for rehabilitation and care." Petitioner asserted that, upon admission to Wellbridge, AH had three pressure ulcers, or bedsores—two on his coccyx and one on his left heel, "all noted and present at the time of admission to the facility." Petitioner also asserted that respondent completed AH's intake history and examined AH, but documented no rashes or ulcers and otherwise "failed to note and document a detailed description of the patient's current wounds," and that, on the same day, staff was directed to monitor AH's left heel, but no orders addressed the wounds on his coccyx.

Petitioner also alleged that, on March 18, 2019—four days after AH's admission to Wellbridge—a physician's assistant (PA) had examined AH and noted wounds on his right heel and buttocks, but "failed to note the wound on the patient's left heel and failed to document a detailed description of the patient's wounds;" and on the same day, staff was directed to monitor and treat AH's coccyx wounds twice daily. Petitioner also alleged that, one week later, the PA again examined AH, and again noted the presence of wounds on the right heel and buttocks, but, as before, "failed to note the wound on the patient's left heel and failed to document a detailed description of the patient's wounds."

Petitioner also stated that its retained expert opined that respondent "was negligent and failed to conform to minimal standards of acceptable and prevailing practice" by: (1) failing to properly document AH's wounds upon admission, (2) failing to properly supervise the PA, (3) failing to issue orders to address AH's wounds until four days after admission, (4) discontinuing AH's use of an external catheter, and (5) failing to order "multiple modalities" to care for AH's wounds. In Count I, petitioner alleged that respondent's conduct violated general duty by way of "negligence or failure to exercise due care, including negligent delegation to or supervision of employees or other individuals," in violation of MCL 333.16221(a). In Count II, petitioner alleged that respondent's conduct demonstrated incompetence, in violation of MCL 333.16221(b)(*i*).

## B. ADMINISTRATIVE LAW JUDGE HEARING

---

[2] Initials have been used throughout these proceedings to protect the patient's identity.

In October 2022, a hearing was held before an administrative law judge (ALJ), during which the ALJ heard testimony from a BPL investigator, an expert witness from both parties, and respondent.

The petitioner's expert witness, Madeline Krissoff, M.D., was qualified as an expert in internal medicine and geriatrics, including pressure wounds and ulcers. Dr. Krissoff asserted that respondent violated the Public Health Code (PHC), MCL 333.1101 *et seq.*, by failing to diagnose and treat AH's wounds, leading to a decline in his condition and resulting in his admission to the UM Hospital. Dr. Krissoff stated that a reasonably prudent medical doctor would have seen and documented AH's pressure ulcers during his history and physical (H & P). Dr. Krissoff also stated that the first reference to treatment of AH's coccyx wounds was not made until four days after AH arrived at Wellbridge, and AH's care plan was generated by the nursing staff with no indication that a doctor had any input into it. Dr. Krissoff further testified that the "progress notes" created by the PA, and signed by respondent, noted a wound on AH's buttock, but also noted a wound on his right heel rather than his left heel. Dr. Krissoff opined that, if a physician signs a PA's note as an author, the physician has the responsibility to ensure that the note is accurate.

The respondent's expert witness, Iris Boettcher, M.D., was qualified as an expert in internal and geriatric medicine. Dr. Boettcher acknowledged that respondent's documentation of his initial assessment of AH "could have been better," but stated that "it was certainly within the minimal standard of care." She testified that a skilled nursing facility, such as Wellbridge, provides "team-based care," in which the physician "is responsible for writing the orders and care plan oversight." In her opinion, respondent exercised appropriate oversight and issued appropriate orders for AH's care plan. Dr. Boettcher did not believe that AH's condition worsened during his stay at Wellbridge. She also stated that she had no concerns regarding respondent's oversight in this case, explaining that, although there was an error regarding the location of a heel wound, it had no significant impact on the overall care the PA provided, which met the "minimal standards."

Respondent testified that he was the medical director and sole attending physician at Wellbridge, as well as the chief executive officer of Theoria, which he described as "a post-acute care health technology, as well as medical management organization." As for AH's arrival at Wellbridge, respondent testified that he was completing his rounds at 9:00 or 10:00 p.m. when a nurse asked him to evaluate a "new arrival." He described AH as extremely sick, with multiple comorbidities, and stated that, when he examined AH, he focused on the chief complaint for which he was admitted to Ascension, and made sure that AH had appropriate antibiotics and sepsis screening. Respondent added that he was not notified of AH's transfer beforehand, there was no documentation that AH had any wounds, and he was unaware of any wounds when he completed AH's H & P. Respondent agreed that his skin inspection revealed " 'no rashes or ulcers' " and begrudgingly admitted that he had failed to note and document a detailed description of the patient's current wounds. Nevertheless, he testified that he was notified of AH's wounds five hours later—due to the care plan he had put into place—and he and the Wellbridge staff generated and implemented an appropriate care plan. Respondent denied that AH's family was displeased with the care he received at Wellbridge, asserting that it was only AH's wife who requested a transfer against medical advice. Respondent further asserted that he had not reviewed the PA's progress notes and had no legal responsibility to do so. He explained that the electronic health-records (EHR) software used by Wellbridge was subpar, and his apparent signature on the PA's notes was added by a "glitch" in the interface of the two software systems.

-3-

## C. ALJ DECISION

In June 2023, the ALJ issued a lengthy proposal for decision (PFD). Addressing the allegation that respondent failed to document ulcers or rashes at the time that AH was admitted, the ALJ found the testimony of Dr. Krissoff more credible than that of respondent and his expert, Dr. Boettcher, and concluded that petitioner "has shown, by a preponderance of the evidence, that Respondent violated MCL 333.16221(a) by failing to visualize and document the rash and pressure ulcers during his March 14, 2019, examination of patient A.H."[3] Addressing the allegation of improper supervision, the ALJ found that petitioner "has proven by a preponderance of the evidence that Respondent violated MCL 333.16221(a) by failing to properly supervise [the pertinent] physician's assistant . . . as alleged in the Administrative Complaint."

Addressing Count I of the complaint, the ALJ concluded that petitioner "has proven by a preponderance of the evidence that [respondent's] failure to visualize or document A.H.'s pressure ulcers, and his failure to properly supervise [the] physician assistant . . . constitute negligence within the meaning of MCL 333.16221(a)." Addressing Count II, the ALJ concluded that, although petitioner had proven that respondent "violated a general duty and was negligent in certain respects," the evidence did not "support a conclusion that his violations of the standard of care [rose] to the level of a [sic] 'incompetence' within the meaning of MCL 333.16221(b)(*i*)." Thereafter, respondent filed objections to the PFD.

## D. DSC ORDER

In its final order, the DSC accepted the ALJ's findings of fact and conclusions of law and placed respondent on probation "for a minimum of one (1) day, and not to exceed six (6) months, commencing on the effective date of this Order." The terms of probation included completion of 10 hours of continuing education and compliance with the PHC. The DSC also fined respondent $2,500, to be paid within six months. Respondent moved for reconsideration, which the DSC denied. Respondent now appeals.

## II. PRESERVATION AND STANDARD OF REVIEW

Because these issues were specifically raised before, and addressed by, the ALJ and the DCS, they are preserved for appellate review. See *Meier v Pub Sch Employees' Retirement Sys*, 343 Mich App 571, 579-580; 997 NW2d 719 (2022); *In re Sangster*, 340 Mich App 60, 71-72; 985 NW2d 245 (2022).

"Rulings by disciplinary boards or subcommittees are reviewed on appeal solely under Const 1963, art 6, § 28." *In re Sangster*, 340 Mich App at 66. Const 1963, art 6, § 28 states that appellate review of these rulings includes, "as a minimum, the determination whether such final decisions, findings, rulings and orders are authorized by law; and, in cases in which a hearing is required, whether the same are supported by competent, material and substantial evidence on the

---

[3] The ALJ further found that petitioner failed to establish that: (1) respondent violated MCL 333.16221(a) by failing to provide treatment to AH's coccyx wound before March 18, 2019, discontinuing the use of the external catheter, or failing to provide multiple modalities of treatment for AH's wounds; or (2) AH was transferred to the UM Hospital for sepsis or infected ulcers.

whole record." Within this context, "a decision is not 'authorized by law' when it is in violation of a statute or a constitutional provision, in excess of an agency's statutory authority or jurisdiction, made upon unlawful procedure that results in material prejudice, or when it is arbitrary and capricious." *In re Sangster*, 340 Mich App at 67.

We "must review the entire record, not just the portions that support an agency's findings, when assessing whether the agency's decision was supported by competent, material, and substantial evidence on the whole record. 'Substantial evidence' means evidence that a reasonable person would find acceptably sufficient to support a conclusion." *Id*. (citation omitted). Administrative findings of fact and conclusions of law premised primarily on credibility determinations will generally not be disturbed, and "[a] reviewing court may not set aside factual findings supported by the evidence merely because alternative findings could also have been supported by evidence on the record or because the court might have reached a different result." *Id*. (quotation marks and citation omitted). We "must generally defer to an agency's administrative expertise." *Id*. (quotation marks and citation omitted). Therefore, "it does not matter that the contrary position is supported by more evidence, that is, which way the evidence preponderates, but only whether the position adopted by the agency is supported by evidence from which legitimate and supportable inferences were drawn." *Id*. (quotation marks and citation omitted; alteration in original).

Respondent's due-process argument presents a constitutional question which we review de novo. See *Shahid v Dep't of Health & Human Servs*, 333 Mich App 267, 273; 963 NW2d 638 (2020).

III. STANDARD OF CARE

Respondent first argues that the DSC's conclusion that he violated the standard of care by failing to discover or document AH's pressure injuries was not supported competent, material, and substantial evidence on the whole record. We disagree.

Under MCL 333.16231(1), a person or governmental entity who believes that a violation of article 15 of the PHC has occurred may submit a written allegation to LARA. MCL 333.16221 provides that LARA "shall investigate any allegation that 1 or more of the grounds for disciplinary subcommittee action under this section exist . . . ." LARA may issue a formal complaint, MCL 333.16231(6)(a), and, after an investigation, must provide a copy of the complaint to the appropriate disciplinary subcommittee, MCL 333.16221. Grounds for action by a disciplinary subcommittee include "a violation of general duty, consisting of negligence or failure to exercise due care, including negligent delegation to or supervision of employees or other individuals, whether or not injury results . . . ." MCL 333.16221(a). Under MCL 333.16231a(1) and (2), if the parties cannot reach agreement, a hearing must be held before a hearings examiner, who "shall determine if there are grounds for disciplinary action," and "prepare recommended findings of fact and conclusions of law for transmittal to the appropriate disciplinary subcommittee." If the disciplinary subcommittee finds ground for action under MCL 333.16221(a), it "shall impose" one or more sanctions, including "probation, limitation, denial, suspension, revocation, permanent revocation, restitution, or fine." MCL 333.16226(1).

In this case, the parties do not dispute that AH suffered from three pressure wounds upon his arrival at Wellbridge. Wellbridge records establish the AH suffered from wounds on his coccyx

-5-

and left heel at the time of his admission.[4]  Respondent admitted that the wounds existed at the time he examined AH.  He also admitted that when he examined AH, he did not turn him over or examine his heel.  Yet the H & P he authored following the examination stated, "Skin: Inspection: No rashes or ulcers."

Petitioner's expert, Dr. Krissoff, testified that a reasonably prudent medical doctor in respondent's situation would have a duty to examine the patient's skin and to document any wounds found.  She added that, if the doctor was unable to turn the patient for further examination, a reasonable physician would document that limitation.  Dr. Krissoff further testified that a reasonable and prudent physician would have seen and documented the wound on AH's left heel, and that respondent's failure to do so was not excused by the nursing staff's subsequent documentation.  In her opinion, a reasonably prudent medical doctor would have observed and documented AH's pressure ulcers.  Conversely, respondent's expert, Dr. Boettcher, testified that although respondent's failure to document those ulcers was an oversight or a mistake, it did not violate the standard of care.

The ALJ found Dr. Krissoff's testimony "more credible" on this issue, and also noted Dr. Boettcher's testimony that that the failure to document the wounds was a "mistake."  The ALJ specifically credited Dr. Krissof's testimony that respondent should have observed and described the wounds, should have documented the parts of AH's body that he actually observed, and should have requested assistance or documented that he was unable to view the buttocks.  The ALJ found that respondent's failure to do so was not excused by the subsequent examination that the nurses completed.  The ALJ concluded that "Petitioner has shown, by a preponderance of the evidence, that Respondent violated MCL 333.16221 (a) by failing to visualize and document the rash and pressure ulcers during his March 14, 2019, examination of patient A.H."  We are satisfied that this conclusion was supported by competent, material, and substantial evidence.

" 'Competent evidence' is defined as '[t]hat which the very nature of the thing to be proven requires . . . .' "  *Goff v Bil-Mar Foods, Inc*, 454 Mich 507, 514 n 5; 563 NW2d 214 (1997) (alteration in original), overruled in part on other grounds by *Mudel v Great Atlantic & Pacific Tea Co*, 462 Mich 691; 614 NW2d 607 (2000), quoting *Black's Law Dictionary* (6th ed).  "Material" means " '[i]mportant; more or less necessary; having influence or effect . . . .' "  *Goff*, 454 Mich at 514 n 5 (alteration in original), quoting *Black's Law Dictionary* (6th ed).  "Substantial" means " '[o]f real worth and importance; of considerable value; . . . actually existing; real; . . . not illusive; solid; true; veritable.' "  *Goff*, 454 Mich at 514 n 5 (alteration in original), quoting *Black's Law Dictionary* (6th ed).  In *In re Sangster*, 340 Mich App at 67 (citation omitted), this Court described substantial evidence as "evidence that a reasonable person would find acceptably sufficient to support a conclusion.  This may be substantially less than a preponderance of evidence, but does require more than a scintilla of evidence."

We conclude that the testimony of Dr. Krissoff and the documentary evidence clearly constituted "competent evidence" supporting the conclusion that respondent violated the standard of care.  This evidence was also material in that it was important, necessary, and clearly influenced

---

[4] The wounds were noted on a skin and wound evaluation that was performed by nurses on the date of AH's admission.

the ALJ's conclusion. This evidence was also substantial in that a reasonable person could find it sufficient to support the ALJ's conclusion. Petitioner's arguments to the contrary lack merit. Although the evidence might also have supported a finding in respondent's favor, whether a contrary position had evidentiary support is irrelevant if the agency's decision was supported by legitimate and supportable inferences drawn from the evidence. *Id.* In this case, the agency's decision was supported by such evidence.

Moreover, administrative findings of fact and conclusions of law premised primarily on credibility determinations will generally not be disturbed and, as noted, "[a] reviewing court may not set aside factual findings supported by the evidence merely because alternative findings could also have been supported by evidence on the record or because the court might have reached a different result." *Id.* (quotation marks and citation omitted). Because the ALJ's conclusion was premised largely on a credibility evaluation of the witnesses, the DSC had a reasonable basis for adopting that conclusion. See *id*.

Respondent also objects to the ALJ's conclusions that, "[e]ven if [respondent] had no duty to perform a skin assessment, having undertaken that task, he falsely documented that A.H. had no skin rashes or ulcers," and that, "by documenting that A.H. had no wounds when there were wounds, Respondent violated the standard of care." Citing *Merriam-Webster's Collegiate Dictionary* (11th ed), respondent argues that to do an act "falsely" requires that it be done "deceitfully, dishonestly, or deceptively," which there is no evidence of in this case. But an act need not necessarily be done deceitfully, dishonestly, or deceptively to be false. Rather, "false" can also simply mean untrue, wrong, or erroneous, and "[w]hat is false can be so by intent, by accident, or by mistake." *Black's Law Dictionary* (12th ed).

Respondent's defense is largely premised on the assertion that AH suffered no harm during his stay at Wellbridge. But as noted, a disciplinary subcommittee may find a violation of general duty "whether or not injury results." MCL 333.16221(a). Because the ALJ's findings of fact and conclusions of law were supported by competent, material, and substantial evidence on the whole record, the DSC did not err by adopting the PFD, including the ALJ's conclusion that respondent's failure to discover or document AH's pressure ulcers constituted negligence within the meaning of MCL 333.16221(a).

IV. NEGLIGENT SUPERVISION

Respondent further argues that the DSC's conclusion that he was liable for negligent supervision of the PA was neither authorized by law nor supported by competent, material and substantial evidence on the whole record. We disagree.

A PA may only operate under a practice agreement with a participating physician. MCL 333.17047(1). The practice agreement must include, *inter alia*, "[a] process between the physician's assistant and participating physician for communication, availability, and decision making when providing medical treatment to a patient." MCL 333.17047(2). Before March 22, 2017, a PA was authorized to "provide medical care services only under the supervision of a physician or properly designated alternative physician, and only if those medical care services are within the scope of practice of the supervising physician and are delegated by the supervising physician." MCL 333.17076(1), as amended by 2011 PA 210. But as amended by 2016 PA 379, MCL 333.17076(1) now provides that a PA "may make calls or go on rounds in private homes,

public institutions, emergency vehicles, ambulatory care clinics, hospitals, intermediate or extended care facilities, health maintenance organizations, nursing homes, or other health care facilities in accordance with a practice agreement." As amended, MCL 333.17076 contains no reference to "supervision" by a physician. Moreover, MCL 333.17049(2) provides as follows:

> Notwithstanding any law or rule to the contrary, a physician is not required to countersign orders written in a patient's clinical record by a physician's assistant with whom the physician has a practice agreement. Notwithstanding any law or rule to the contrary, a physician is not required to sign an official form that lists the physician's signature as the required signatory if that official form is signed by a physician's assistant with whom the physician has a practice agreement.

In this case, respondent testified that his practice agreement with the PA required him to be available to her and audit at least 10 of her notes every six months. Respondent explained as follows: "I have responsibility to provide oversight with her, but it's not to review every single note, to review every single care plan, to review every single order. That's not my responsibility, nor is it legally required of me." But he also testified that: (1) he met with her more frequently, perhaps every day or two; (2) he would randomly spot check 10 or 15 of her notes to ensure that her documentation was appropriate; and (3) had he reviewed her progress notes in this case, he would have told her that she documented the wrong foot, explained how to correct the error, and perhaps implemented a performance-improvement plan for the next 30 days. By his own testimony, then, by entering into the practice agreement, respondent had assumed, at a minimum, a limited contractual duty to "provide oversight" and supervise the PA. For the reasons discussed next, we conclude that the DSC did not exceed its authority by adopting the ALJ's determination that respondent negligently supervised the PA.

The PA's relevant progress notes both: (1) erroneously indicated that AH had a wound on his right heel, rather than his left heel; and (2) contained the following notation: "Author: Justin Di Rezze Physician – Physician [e-SIGNED]." Dr. Krissoff testified that when a physician's signature appears on a progress note, the physician thereby represents that the note is accurate: "It's understood that that would be the case that the record was reviewed and agreed with and signed, co-signed." The ALJ found Dr. Krissoff's testimony credible on this issue, and quoted the following passage from Dr. Krissoff's report:

> [Respondent's] care of this patient shows evidence of negligence or failure to exercise due care, in that not only did he not visualize the wounds, he did not properly supervise his physician's assistant. From the records of [the PA's] progress notes dated March 18, 2019, and March 22, 2019, it is not clear whether she visualized the wounds either. In the March 18, 2019, visit, she only stated "right heel wound and buttock wound" without any description of size, evidence of infection, or other detail. In the documentation of the March 22, 2019, visit, there is also nothing to suggest that she actually visualized the wounds. She states, "no wound changes per staff" suggesting that she got her information on the wounds from staff, not from direct visualization.

The progress notes, along with Dr. Krissoff's testimony and report, constituted competent, material, and substantial evidence supporting the ALJ's conclusion that respondent failed to properly supervise the PA. Although the evidence might also support a finding in respondent's favor, whether the evidence might have supported a contrary position is irrelevant if the agency's decision was supported by legitimate and supportable inferences drawn from the evidence. *In re Sangster*, 340 Mich App at 67. In this case, the agency's decision was supported by such evidence.

The ALJ considered respondent's testimony that he did not review, sign, or otherwise adopt the PA's notes and that the appearance of his signature was a result of the integration of medical records. Nevertheless, the ALJ found petitioner's argument "persuasive and supported by the evidentiary record," explaining that "Dr. Krissoff credibly testified that [respondent's] signature indicates that he bears a responsibility for the note's accuracy." The ALJ concluded that "as the attending physician and medical director, he cannot now disavow the WellBridge records, which indicate that he did sign them."

The ALJ clearly found Dr. Krissoff's testimony on this issue more persuasive than respondent's. Because the ALJ's conclusion was premised largely on a credibility evaluation of the witnesses, the DSC had a reasonable basis for adopting that conclusion. See *id*.

On appeal, respondent argues that his signature only appeared on the PA's notes as a result of the production of records for this proceeding. But this assertion is undercut by respondent's following testimony at the hearing: "And you know, much to [opposing counsel's] dismay, the e-signature is actually one of the problems that we brought up multiple times." If the issue arose only in the course of gathering records for this proceeding, there would have been no need to raise the issue multiple times before this proceeding commenced.

Respondent also argues that the ALJ proceedings violated his right to due process, under the state and federal Constitutions,[5] because he had no notice before the first day of the hearing of the "specific charges" that: (1) he reviewed and signed the PA's erroneous notes, (2) he developed a software system that provided a false impression that he adopted the PA's notes, or (3) these acts violated the PHC. "Due process and the Administrative Procedures Act require that a party in a contested case be given timely and adequate notice detailing the reasons for the proposed administrative action." *Hardges v Dep't of Social Servs*, 177 Mich App 698, 702; 442 NW2d 752 (1989). We conclude that given the specificity of the complaint, the ALJ correctly rejected respondent's due-process argument.

As an initial consideration, the ALJ did *not* conclude that respondent violated the PHC simply by signing or otherwise adopting the PA's notes. The portion of the PFD respondent cites in support of this argument presents a quotation of petitioner's argument on this issue, not a finding of the ALJ. Although the ALJ found petitioner's argument persuasive, it did so only with regard to the negligent supervision of the PA, and respondent was never charged with violating the PHC by signing or adopting the notes. Indeed, the ALJ clearly stated, when finding that the PA had erroneously documented a wound on AH's right heel, "this allegation, standing alone, does not prove that [respondent] violated the Code based on [the PA's] errors," but that "this allegation is

---

[5] US Const, Am XIV, § 1; Const 1963, art 1, § 17.

relevant to the issue of whether [respondent] improperly supervised [the PA] . . . ." Moreover, the issue of respondent's signature only grew in importance because respondent vehemently denied having signed or otherwise reviewed the PA's notes, and petitioner's argument, as quoted by the ALJ, was a response to respondent's denial rather than a new, specific charge.

The ALJ correctly concluded that negligent supervision was properly raised. Paragraphs 9 and 11 of the complaint clearly alleged that the PA had examined AH twice, each time erroneously noting a wound on his right heel, while failing to document a wound on his left heel or provide a detailed description of his wounds. The complaint alleged a failure to properly supervise the PA as follows:

> Respondent failed to properly supervise [the PA] who examined the patient on March 18, 2019, and March 25, 2019. In both assessments, [the PA] noted the heel wound was on the patient's right heel, rather than the patient's left heel where the wound was actually located. [The PA] failed to document a detailed description of the wounds and there is nothing in [the PA's] documentation that suggests [the PA] visualized and examined the wounds.

Count I of the complaint alleged a violation of a general duty, under MCL 333.16221(a), "including negligent delegation to or supervision of employees or other individuals, whether or not injury results . . . ." Accordingly, any reasonable person would know that petitioner was advancing a claim of negligent supervision in its complaint.

Affirmed.

/s/ Kirsten Frank Kelly
/s/ Sima G. Patel
/s/ Kathleen A. Feeney